# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

| | |
|---|---|
| SUSAN A. GILBERT, | |
| Plaintiff, | No.  18-CV-2045-LTS-KEM |
| vs. | **REPORT AND RECOMMENDATION** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

_____

Plaintiff Susan A. Gilbert seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434.  Gilbert argues that the administrative law judge (ALJ), Matthew J. Gordon, erred in determining her residual functional capacity (RFC).  Specifically, Gilbert argues that the ALJ discounted her treating psychiatrist's RFC opinion without providing a good reason; that the ALJ failed to acknowledge or assign weight to her therapist's RFC opinion; and that some medical evidence does not support the ALJ's failure to include a limitation to one- and two-step tasks.  Gilbert also raises (for the first time) an Appointments Clause challenge in reliance on *Lucia v. SEC*, 138 S. Ct. 2044 (2018).  I recommend **affirming** the ALJ's decision.

## I.    BACKGROUND[1]

During the summer before her senior year of high school, in 2002, Gilbert was in a serious car accident that resulted in a concussion and a lasting brain injury.  AR 13,

_____

[1] For a more thorough overview, see the Joint Statement of Facts.  Doc. 9.

270.[2]  She was able to complete high school, although she failed some classes, and as a result, she did not graduate a semester early as she had planned.  AR 270.  After high school, she maintained full-time employment through March 2014, married, and gave birth to a daughter around September 2012.  AR 214-19.

Beginning in March 2013, Gilbert found work through a temporary-employment agency in a data-entry position.  AR 214-15, 350, 352.  The company declined to hire her permanently because she did not have a degree, and she was laid off in June 2013.  AR 214, 350, 352.  She enrolled in classes at the local community college in the accounting program and found work at a nursing home by August 2013.  AR 218, 278, 348.  Originally, she worked as a van driver, coordinating schedules and transporting nursing-home patients to their appointments, but she did not get along well with her boss and was written up for forgetting appointments.  AR 344, 348, 436.  She also had difficulties balancing being a full-time student while working full time, achieving only a 1.4 grade point average (GPA) for the fall 2013 semester (even after she dropped a class), so she switched from accounting to the early childhood development program for the spring 2014 semester.  AR 278, 344, 348.  She continued to struggle, suffering a panic attack at work when she had to stay late and miss class, and by early March 2014, she reported failing several classes (despite dropping a class again to reduce her course load).  AR 278, 336, 344.  When she sustained a shoulder injury, she was transferred to working in laundry, and the nursing home decided that given "her problems with organization, focus, [and] concentration," she could not return to the van-driving position for safety reasons.  AR 338, 342.  She worked as a housekeeper for about a month at the nursing home before suffering a panic attack (triggered by discovering a patient's cancer had spread) on March 7, 2014.  AR 332.  She initially planned to resign, but the nursing home allowed her to take medical leave.  AR 332, 334.  She never returned to working

_____

[2] "AR" refers to the administrative record below (Docs. 7-2 to 7-11).

2

at the nursing home. AR 218. Instead, sometime in April 2014, she began working part-time at her daughter's daycare as an assistant in the kitchen to receive a discount on her daughter's childcare costs. AR 216, 364, 547, 568.

On April 7, 2014, the community college placed Gilbert on academic probation, advising that she reduce her work hours and receive help from Academic Support. AR 282. Gilbert's grades improved during her next two years of school, when she no longer worked full time and she received accommodations, including receiving copies of teachers' and students' notes, having the option to take short breaks, and taking tests in a quiet testing center with extra time. AR 276-78. She graduated in May 2016. AR 694. She worked limited hours at the daycare through the spring of 2015, until her hours were cut for budgetary reasons and she was unavailable during the time needed. AR 214, 216, 264, 477, 547, 568. She did not work again until November 2016, when she started working fifteen hours a week as a kitchen assistant and lunch server at the local elementary school (although she had applied and interviewed for daycare positions after graduating from the early childhood and development program at the community college). AR 59-60, 687. She quit in April 2017, which she testified (in July 2017) was because her performance was inhibited by her mental-health issues and she was on the brink of getting fired, but she told her psychiatrist at the time that she quit to open her own in-home daycare. AR 59-63, 656, 658, 663, 819.

In November 2014 (before she graduated from community college, and while working part-time at the daycare), Gilbert applied for DI benefits, alleging a disability onset date of March 8, 2014 (when she stopped working full time). AR 87-88. Her application was denied initially in August 2015 and on reconsideration in November 2015. AR 87-115. In connection with those reviews, state agency psychological consultants Jonathan Brandon, PhD, and Dee Wright, PhD, reviewed treatment records

and information provided by Gilbert to evaluate her RFC.[3]  AR 94-97, 109-112.  In forming their opinions, they also considered and discussed a February 2015 neuropsychological examination by Richard Roberts, PhD, performed at the request of Gilbert's primary care provider (AR 427-33); a March 2015 RFC opinion submitted by Gilbert's therapist, Adarienne Burrow, MA, LMHC, NCC (Therapist Burrow), who worked at the student health clinic at Gilbert's community college (AR 440-42); and the results of a June 2015 consultative examination ordered by the Social Security Administration and performed by Carroll Roland, PhD (AR 517-22).  *See* AR 96-97, 111.

Gilbert requested a hearing before an ALJ, who held a video hearing on July 25, 2017.  AR 10, 38-39.  Gilbert and a vocational expert (VE) testified at the hearing.  AR 38-39.  On October 4, 2017, the ALJ issued a written opinion denying Gilbert's request for benefits, following the familiar five-step process outlined in the regulations[4] for determining whether Gilbert was disabled.  AR 10-23.  The ALJ found that Gilbert's part-time work did not rise to the level of substantial gainful activity and did not preclude her from obtaining benefits.  AR 12.  The ALJ found that Gilbert suffered from several severe mental-health impairments, including generalized anxiety disorder, attention deficit hyperactivity disorder (ADHD), and cognitive dysfunction from a traumatic brain

---

[3] RFC is "'what the claimant can still do' despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (quoting *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987)).

[4] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. § 404.1520(a)(4)**.  The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)).

injury.  AR 13.  To determine whether Gilbert could still work despite her impairments (at steps four and five), the ALJ determined Gilbert's RFC as follows:

> [T]he claimant has the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations:  she must avoid hazards such as unprotected heights and dangerous machinery; she may perform low stress work, defined as:  simple, routine tasks, with simple work related decision and few if any changes in work setting, and no production rate pace work (i.e. no assembly line work); she is limited to a moderate noise level environment; also no operation of a motor vehicle to carry out job duties; she may have occasional contact with supervisors, coworkers, but no tandem work, it would not be necessary to work with others to carry out job duties; no work with the public.

AR 15.[5]  In forming this RFC, the ALJ assigned "great weight" to the results of Dr. Roberts's neurocognitive testing, partial weight to Dr. Roland's consultative-examination opinion, partial weight to Dr. Brandon's and Dr. Wright's nonexamining opinions, and little weight to the June 2017 RFC opinion by Gilbert's treating psychiatrist, Ann Rathe, MD (AR 908-913).  *See* AR 18-20.  The ALJ did not cite or discuss Therapist Burrow's opinion.  Based on his determination of Gilbert's RFC and the testimony of the VE, the ALJ found that Gilbert could not perform any past relevant work but that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." AR 21.  Specifically, the ALJ found that Gilbert could work as a janitor, hospital cleaner, or laundry worker.  AR 22.  The ALJ concluded that Gilbert was not disabled during the relevant time period of March 8, 2014, to October 4, 2017.  AR 22-23.

The Appeals Council denied Gilbert's request for review on May 9, 2018 (AR 1-3), making the ALJ's decision that Gilbert was not disabled the final decision of the Commissioner.  *See* **20 C.F.R. § 404.981**.  Gilbert filed a timely complaint in this court (Doc. 1).  *See* **20 C.F.R. § 422.210(c)**.  The parties briefed the issues (Docs. 10-12),

---

[5] Occasionally is a term of art meaning "very little up to one-third" of an eight-hour workday. *See* **Dictionary of Occupational Titles (DOT), App. C(IV)**; *see also, e.g.*, **Social Security Ruling (SSR) 96-9P**, 61 Fed. Reg. 34478, 34480 (July 2, 1996).

5

and the Honorable Leonard T. Strand, Chief United States District Judge for the Northern District of Iowa, referred this case to me for a Report and Recommendation.

## II.    DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Kirby*, 500 F.3d at 707. The court "do[es] not reweigh the evidence or review the factual record de novo." *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994). If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision." *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

Gilbert argues that the ALJ erred in determining her RFC because the ALJ did not give a good reason for discounting her treating psychiatrist's RFC opinion or acknowledge her therapist's RFC opinion. Gilbert also argues that all the medical opinions support a limitation to work involving only one- to two-step tasks, and the ALJ erred by failing to include such a limitation in his RFC determination. Finally, Gilbert argues that the ALJ's appointment to that position violates the Appointments Clause of the United States Constitution.

### A. Weight to Treating-Source Opinion

When determining a claimant's RFC, the ALJ considers medical opinions "together with the rest of the relevant evidence." **20 C.F.R. § 404.1527(b)**. "The ALJ must give 'controlling weight' to a treating [source's] opinion if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent

6

with the other substantial evidence.'" ***Papesh v. Colvin***, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting ***Wagner v. Astrue***, 499 F.3d 842, 848-49 (8th Cir. 2007)); *see also* **20 C.F.R. §§ 404.1527(c)(2)**. "Whether the ALJ gives the opinion of a treating [source] great or little weight, the ALJ must give good reasons for doing so." ***Reece v. Colvin***, 834 F.3d 904, 909 (8th Cir. 2016). The ALJ considers the following factors to determine the weight to assign any opinion assessing a claimant's RFC:

> (1) whether the source has examined the claimant; (2) the length, nature, and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."

***Owen v. Astrue***, 551 F.3d 792, 800 (8th Cir. 2008) (quoting the current **20 C.F.R. § 404.1527(c)**).

Gilbert's treating psychiatrist, Dr. Rathe, opined that Gilbert suffered moderate limitations, defined as "preclud[ing] performance up to 20% of an 8 hour work day or 40 hour work week," in her ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; perform activities within a schedule; and sustain ordinary routine without special supervision. AR 910-11. Dr. Rathe found Gilbert suffered marked limitations (precluding performance more than 20% of the time) in being punctual within customary tolerances; responding appropriately to changes in the work setting; and setting realistic goals or making plans independently of others. AR 910-12. Dr. Rathe found Gilbert extremely limited (defined as unable to function in a regular, reliable, and sustained schedule) in maintaining attention and concentration for extended periods of time and in maintaining regular attendance, opining that she would miss work more than three times a month. AR 910-11. She also found Gilbert extremely limited in her ability to work in coordination with

or proximity to others without being distracted by them. AR 911. In evaluating Gilbert's ability to work "without interruptions from psychological based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," Dr. Rathe opined that Gilbert had marked limitations in her ability to complete a normal work day and extreme limitations in her ability to complete a normal work week. AR 911. Dr. Rathe noted only mild limitations in several categories of social interaction, including Gilbert's ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes; to interact appropriately with the public; to ask simple questions or request assistance; and to accept instructions and respond appropriately to criticism from supervisors; but Dr. Rathe noted moderate to extreme limitations (depending on the severity of Gilbert's depression) in Gilbert's ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. AR 911-12. Overall, Dr. Rathe opined that Gilbert suffered marked limitations in her activities of daily living and in maintaining social functioning and that she would frequently to constantly (depending on the severity of her depression) have deficiencies of concentration, persistence, or pace resulting in the failure to complete tasks in a timely manner. AR 912.

The ALJ assigned little weight to Dr. Rathe's opinion, finding it inconsistent with Dr. Rathe's treatment records, the record as a whole, and Gilbert's activities of daily living, among other reasons. AR 20. Gilbert first met with Dr. Rathe in November 2014. AR 268. She sought help with her short-term memory loss (suffered as a result of a car accident in 2002) and with managing stress and emotions, noting that she did not expect Dr. Rathe to be able to "fix her brain" but wanted to know her deficits so that "she c[ould] work around them" and retain a job. *Id.* She reported being able to manage her medications with a daily calendar and schedule and that her concentration was "good" on Adderall, and Dr. Rathe's objective examination was normal. AR 269, 271. Dr.

Rathe increased her Effexor dosage (an antidepressant) and continued her Adderall dosage. AR 271. About a month later, Gilbert presented to the emergency room (ER) and was admitted to the hospital for three days with racing thoughts and complaints of not being able to tell what was reality. AR 404-410. At an appointment with Dr. Rathe shortly after her discharge from the hospital, Gilbert reported that her mood was more even keel since starting risperdone and discontinuing Adderall at the hospital, and Dr. Rathe's objective examination was mostly normal. AR 528-29. Dr. Rathe's treatment notes also reflect that she provided written instructions to Gilbert regarding her medication changes. AR 529.

Risperdone caused undesirable side effects, so Dr. Rathe prescribed olanzapine for Gilbert by telephone. AR 530. At Gilbert's next appointment with Dr. Rathe in late December 2014, Gilbert reported a low mood, and her husband (who accompanied her to the appointment) reported that she "sees stuff at home that she should be doing and gets overwhelmed that she can't do it." *Id*. Gilbert stated that she would return to community college full-time in a few weeks (she was on winter break) and that the structure of school helped her. *Id*. Two weeks later, Gilbert reported that she had needed "reassurance and direction at times from" her husband while on winter break from school, sometimes having to ask her husband what she should be doing, but that she was able to focus at school "ok" even without Adderall. AR 532-33. Dr. Rathe restarted Gilbert on Adderall, and she called a few days later to report she was doing very well. AR 535. In early February 2015, she continued to complain of a depressed mood, stating that she was sleeping well but had low energy; and that she had a "lack of enthusiasm about things" and was "just going thr[ough] the motions." *Id*. She reported trying to exercise more. *Id*. She stated Adderall "help[ed] her stay on task and concentrate" for class, but she had been missing doses, so Dr. Rathe suggested she set a phone alarm. *Id*. Her husband accompanied her to the appointment and reported that she was "more

9

organized," "[h]er thoughts are more on topic[,] and she's better able to keep track of what is supposed to happen when," but that she had no ambition. *Id*. Dr. Rathe adjusted Gilbert's medications to try to improve her depression. AR 536. At these appointments from late December 2014 to February 2015, Dr. Rathe's objective examinations were normal (including recent and remote memory) except for mood and affect. AR 531, 533, 535-36.

At an appointment with Dr. Rathe in late February 2015, Gilbert and her husband reported she was doing better on new medication and Adderall, including being able to get chores done, although she was still somewhat distractible during tasks. AR 537. Dr. Rathe's objective examination was normal, and she continued Gilbert on her current medications. AR 538. At her next appointment with Dr. Rathe a month later, Gilbert reported doing poorly, and Dr. Rathe noted that Gilbert had called between appointments to restart Lorazepam because of situational anxiety and that she had called the day prior to report an increase in panic attacks triggered by her family's decision to foster two special-needs children. AR 540. Gilbert told Dr. Rathe that she had forgotten she had called to ask about taking Lorazepam, so she had not picked up her prescription, and she stated she had run out of Adderall a week ago. AR 540. Gilbert reported that her husband traveled for work so she had been caring for the children on her own until their bedtime, which was overwhelming; that she had missed two classes because of the lack of childcare for the foster children; and that she was able to do housework when the children were gone, but her house was in disarray, and she had been sleeping a lot. *Id*. Dr. Rathe noted a normal objective examination except for mood, affect, and hygiene. AR 541. Dr. Rathe added Lorazepam, and when Gilbert called a week later reporting that she continued to be tearful and anxious, Dr. Rathe increased the dosage of her antipsychotic medication. AR 543. Gilbert met with Dr. Rathe for an appointment a week after that, in early April 2015, in which she reported improved anxiety and denied

problems with concentration, but noted continuing to suffer low energy and motivation (and was sleeping in the waiting room when Dr. Rathe retrieved her for their appointment). AR 543-44. Gilbert told Dr. Rathe that she had not been doing her chores regularly, playing with the kids as much, or washing her hair. AR 543. Dr. Rathe decreased the Lorazepam dosage, believing that caused Gilbert to be oversedated. AR 544. Gilbert called a few days later to report crying spells, and Dr. Rathe discontinued Lorazepam. AR 545; *see also* AR 459. At her next appointment with Dr. Rathe in late April 2015, Gilbert continued to report uncontrollable crying spells, although she noted they were less frequent since discontinuing Lorazepam. AR 545. Dr. Rathe noted that Gilbert was under stress and overwhelmed by her responsibilities caring for her daughter and foster children and being a full-time student, as well as recent abnormal lab results indicating diabetes. AR 545-46. Gilbert noted that school was going well and that Adderall helped her study for school, but it did not help her focus for child-care purposes. *Id.*

Less than two weeks later, in early May 2015, Dr. Rathe met with Gilbert again after she called in tears requesting to be seen as soon as possible. AR 547. Gilbert reported suffering from crying spells and low motivation and energy, although she noted she was able to do basic housework and childcare (the foster children were in school, and her daughter went to daycare), and her concentration was good with Adderall. AR 547-48. She reported completing three out of four of her finals (with one remaining) and that she had lost her part-time daycare job, so she would not be able to afford her daughter's daycare costs anymore. *Id.* On objective examination, Dr. Rathe noted monotone speech, "depressed" mood, and constricted and tearful affect, but normal eye contact, memory, thought processes, judgment, and insight. AR 548. Dr. Rathe adjusted Gilbert's medications and advised her not to foster, as she believed the added stress was bad for her mental health. AR 547-48.

11

A week and a half later, Gilbert again called in tears and asked to be placed on the cancellation list. AR 755, 906. At her appointment a few days later, she stated that the day she had called had been a "bad day," but that she had a good weekend spending time with her family. AR 755. She reported feeling good about her grades on her final exams and that she and her husband had decided to release the foster children to another home, which was "a light at the end of the tunnel." AR 755. Dr. Rathe noted a normal objective examination except for mood and affect, including that Gilbert abruptly started crying during the interview. AR 756. Dr. Rathe changed Gilbert's medication due to side effects. *Id.* A week later, Gilbert called Dr. Rathe to say that she had forgotten about her scheduled appointment but that she was "feeling good" and wanted to cancel. AR 904.

Gilbert's next appointment with Dr. Rathe was in mid-June 2015. She reported improvement with both her mood and tearfulness on her new medication (despite running out of the medication five days prior), although she still had low motivation for home activities and explained the day she canceled her previous appointment had been a "good day." AR 752-53. She reported spending a lot of time with family, going out to eat for her wedding anniversary, and going to the zoo, activities which she "'kind of' enjoyed" or "ended up having fun" doing. AR 752. She had not been to therapy since school ended for the summer, so Dr. Rathe instructed her to contact a therapist right away. AR 753. Dr. Rathe also increased the dosage of her antipsychotic medication. *Id.* In early July 2015, Gilbert reported that she had not been taking the increased dosage of medication because she had been sleeping well and did not feel depressed or anxious (although she reported feeling "sort of blah"). AR 750. She reported enjoying a week-long trip to Arkansas for a family reunion and that her mood was "pretty good" while away (although she did report tearfulness and anxiety one of the days because both sides of her family wanted to see her, but her husband did not think it was abnormal to be

12

tearful in that setting).  *Id*.  Dr. Rathe noted a normal objective examination other than constricted affect and concluded Gilbert was "doing better following vacation and reduced stress at home," although Dr. Rathe still wanted to increase Gilbert's medication dosage because she "remain[ed] somewhat depressed."  AR 751.

By mid-July 2015, Gilbert had become more depressed.  AR 747.  She cried in the lobby for twenty minutes prior to her appointment with Dr. Rathe, and she reported lacking purpose without a job or the structure of school and feeling like a drain on her family.  AR 747.  She noted her ability to do housework was limited by distractibility, low motivation, and tearfulness, and that despite sleeping soundly, she felt tired in the morning and unable to do chores (she stated if she performed chores, it was after lunch).  *Id*.  She had been taking her daughter to the pool but did not enjoy it.  *Id*.  Aside from a tearful affect and depressed mood, Dr. Rathe noted an otherwise normal objective examination and adjusted her medications.  AR 748.  Before her next appointment with Dr. Rathe, Gilbert called to ask for help finding a bipolar support group, and she called another time in tears wondering if Dr. Rathe would support her disability application and noting she was "unsure if she should be applying for" disability "as she d[id] not feel like she [wa]s disabled."  AR 902-03.  In late July 2015, Gilbert continued to report a low mood and feeling unmotivated (including showering only once a week and accomplishing the "bare minimum" of housework), although she reported being less tearful and having "ok" concentration when cooking simple recipes.  AR 745.  Dr. Rathe noted Gilbert "does best when her schedule has structure and routine" and thought Gilbert would benefit from a part-time, low stress job, but she opined Gilbert was "too depressed right now to start a job" and increased Gilbert's medication dosage.  AR 746.  Despite the higher dosage of medication, Gilbert continued to report low motivation in mid-August 2015, although she stated she had been able to complete household chores such as dishes and laundry and that her concentration for simple tasks was "pretty good."  AR

13

740-42. She stated that she had hired cleaning help and that she had arranged to be around family members every day of the week, which cheered her up and eased her anxiety. AR 740. She expressed anxiety about her upcoming field experience for school. *Id*. Dr. Rathe noted Gilbert lacked motivation to shower. AR 742. Dr. Rathe decided to wait two weeks before adjusting her medication to see if her mental health improved any more on the increased dosage of antipsychotic medication. *Id*.

The next month, in September 2015, Gilbert had started school, and her mental health had improved somewhat—she reported still suffering depression and low motivation, but her mood was "not quite as low," her energy was "a little better," and she was "less tearful overall." AR 737, 739. She reported that school was "going pretty good" and that she could concentrate for thirty minutes when reading for school, but she sometimes had to reread passages and struggled to comprehend. AR 737. She noted she had gone to Chicago for a bachelorette party, but she had been anxious, and it had been hard to relax and have fun. *Id*. Dr. Rathe recommended she try a new bipolar medication. AR 739. For a few weeks, she noticed improvements on the new medication and felt more confident and motivated, but in early October 2015, she called Dr. Rathe feeling suicidal, noting that she had failed a college exam the week before and felt nervous about an upcoming exam. AR 733-35, 898. At an appointment with Dr. Rathe the next day, Dr. Rathe also noted that Gilbert's recently helping out at a family party may have resulted in fatigue that "set off a bout of mildly depressed mood and negative thinking." AR 733. Gilbert also stated that her aunt had been helping her clean the house, but she had been unavailable the past two weeks, so the house was messy, and she had been too anxious and unmotivated to go grocery shopping. AR 734. She noted she had still been able to pay attention in class and participate in the discussion, however. *Id*. Dr. Rathe opined that "managing her studies and responsibilities at home" was too much for her but noted Gilbert was committed to doing both. AR 735.

14

At Gilbert's next three appointments with Dr. Rathe, from late October to early December 2015, she reported feeling even-keeled and denied depression, and although she still experienced low energy and motivation, she noted she was doing well in school and had been able to do household chores (with and without help from her aunt), including dishes, laundry, and grocery shopping (although she struggled a bit with the grocery shopping). AR 724-32. Dr. Rathe noted Gilbert was "relatively stable," "doing well," and "definitely doing better with regard to mood" (although Gilbert continued to have anxiety), and by early December, Gilbert reported "feel[ing] like her mood [wa]s doing better than it has in a very long time," even with the stress of the Thanksgiving holiday (which she prepared side dishes for). AR 720, 724-26.

Gilbert called feeling suicidal later in December 2015, possibly triggered by holiday stress or "thinking catastrophically about her academic schedule" for the next semester. AR 720-22, 892. Gilbert noted that over the winter break from school, she had been spending six hours daily scrapbooking. AR 721. She reported lacking motivation to shower or change clothes and "struggle[ing] to get simple chores started," noting that she felt like a burden to her husband, who would like a cleaner house and better-prepared meals. AR 720. Dr. Rathe recommended she be hospitalized, but Gilbert was discharged from the ER when no beds were available. AR 716, 722. The next week, Gilbert missed an appointment with Dr. Rathe, but she called later in the day to say she was doing better (but still depressed). AR 717, 891. She rescheduled her appointment for the next day, where she reported feeling more motivated, having adequate energy, and being able to perform chores and her activities of daily living. AR 716-17. Dr. Rathe noted her affect was "brighter." AR 718.

Gilbert went on vacation and forgot her medications, and she also changed health insurance plans, which disrupted coverage, so when she next saw Dr. Rathe in mid-January 2016, she was not doing well (as she had not been taking her medications as

prescribed). AR 714-16, 886, 888-90. Gilbert could no longer afford her antipsychotic medication on her new insurance, so Dr. Rathe prescribed a new antipsychotic medication. AR 716. Gilbert continued to do poorly at appointments with Dr. Rathe two days later and a week after that, reporting that she had been missing class and her field experience due to feeling tired and wanting to isolate and avoid people. AR 705-07, 709-11. Gilbert revealed that she had not been taking the nighttime dosage of her medications and had been throwing the leftovers away at the end of the week; Dr. Rathe recommended that she download a phone app to help her remember to take her medications and changed the timing of most of her medications to the morning. AR 705, 707. Later in February 2016, Gilbert called Dr. Rathe to report she was feeling suicidal and to cancel an upcoming appointment due to out-of-state travel for a funeral, and she no-showed for an appointment with Dr. Rathe near the end of the month. AR 876, 878, 880. Dr. Rathe also heard from Gilbert's therapist in March 2016 that Gilbert had met with her once in mid-February 2016 and then no-showed for three to four appointments after that (once calling to report she was going out of town for a funeral). AR 875. In early March 2016, Gilbert called Dr. Rathe to report symptoms of mania, and she went to the ER but was not admitted. AR 876. The next week, Gilbert went to the ER again with similar symptoms and noted she had not taken her medications that day. AR 701. She saw Dr. Rathe the next day and reported she had been able to clean her house but could not finish things and bounced from task to task, and she reported overspending. AR 701. On objective examination, Dr. Rathe noted many symptoms of mania, and she tapered one of Gilbert's medications "in case it [wa]s driving her mood instability." AR 703. Over the next week, Dr. Rathe continued to adjust Gilbert's medications by telephone (and Gilbert once reported missing class due to sleeping in with a migraine), and by the end of March 2016, Gilbert reported when she took her medications, she "fe[lt] good" overall, despite "some moments of depression." AR 698, 871, 873-74.

16

Gilbert missed her appointment with Dr. Rathe scheduled for April 12, 2016. AR 694. A week later, Gilbert called asking for her medications to be adjusted due to grogginess and slurred speech in the mornings. AR 694, 870. At an appointment with Dr. Rathe in late April 2016, Gilbert reported that despite feeling less groggy on the decreased dosage of Lorazepam, she had still been sleeping through her alarm and missing class, but her attendance improved once her husband started waking her up in the morning. AR 694. She reported maintaining good grades in her final semester at school and being able to concentrate in class and complete her homework. *Id*. Although she reported "stay[ing] on task pretty well for school," she noted marginal motivation for her activities of daily living and difficulties staying on task when doing chores. *Id*. She noted that she did not have a job lined up once she graduated but "[did not] know if she should get one, since she is waiting for [her] appeals hearing for [social security] disability." *Id*. Dr. Rathe encouraged her to get a part-time job that started in late morning or early afternoon (since she had difficulties waking up in the morning). *Id*. Dr. Rathe noted that Gilbert continued to struggle and that it was "typical for her to" decompensate at the end of each semester due to "anxiety regarding the impending lack of structure." AR 696. The next day, she called Dr. Rathe in tears with passive suicidal ideation after "she found out . . . that she might not graduate because she missed too many field experience hours (50 out of 112) due to illness, including time missed because of grandpa's funeral/med side effects/psych illness/flu." AR 866.

Gilbert was able to graduate, and once her stressors were resolved, her mood "returned to baseline." AR 690. At an appointment with Dr. Rathe on May 23, 2016, she inquired about stopping all medications, noting she did not need help concentrating because she was not in school or working. *Id*. She admitted, however, that she struggled to get tasks completed at home because of concentration. *Id*. She also noted that "[o]n her depressed days[,] she d[id] the minimum chores needed to take care of her husband

17

and daughter," and that maintaining her own hygiene took too much effort. *Id*. She reported applying for volunteer and job opportunities, with an upcoming interview for a paid daycare position; going to the park with her daughter; and "trying to do housework." *Id*. She stated she was "'going crazy' without the structure of school," and on objective examination, Dr. Rathe noted she "continue[d] to do very poorly." AR 690, 692. Dr. Rathe recommended a trial of lithium. AR 692. At an appointment about a week later, Dr. Rathe noted Gilbert appeared calmer. AR 688. Gilbert reported still suffering from low energy and motivation but noted she was able to "get[] basic chores done at home but not much else"; to go for walks and to the park with her daughter (who went to daycare during the day); and to watch Netflix, denying impaired concentration for watching television shows and recalling plots. AR 687. She also reported that she had gone boating with her in-laws and to a graduation party, which caused some anxiety but she "managed." *Id*. She canceled her next appointment due to going out of town, declining to come in earlier because "she fe[lt] like she w[ould] be fine." AR 862. On June 20, 2016, Gilbert reported diminished anxiety but still suffering from low motivation, noting she had been taking her daughter to the pool, attending her niece's softball games, and going out to eat (because "she forgets to plan meals"), but could not "get chores done at home" or laundry. AR 683. Dr. Rathe noted a "slight improvement" on lithium and increased the dosage. AR 685.

When Gilbert saw Dr. Rathe the next month, in July 2016, she reported "feeling good overall." AR 680. She stated she had been keeping her daughter at home, rather than taking her to daycare, and they had been doing activities together like going to the pool or the zoo, which helped provide structure to her days. *Id*. She noted the ability to do laundry (but not fold it), clean dishes, cook, and shower three to four times a week. *Id*. Dr. Rathe noted her affect was brighter, but she still suffered from poor hygiene, concluding she "appears to be doing better following the addition of lithium." AR 682.

Through July, August, and September 2015, Gilbert continued to do well on lithium in combination with her other medications, reporting good mood and the motivation and attention span necessary to do household chores. AR 674-78, 860. In early October 2016, Gilbert's copay increased for one of her medications, so Dr. Rathe decreased the dosage, and a week and a half later, Gilbert called complaining of depression and passive suicidal ideation. AR 846. Dr. Rathe adjusted her medications, and at an appointment a few days later, Gilbert reported feeling better and able to do housework (although Dr. Rathe noted oversedation from her medications—the appointment was at 8:00 a.m., and Gilbert noted she usually slept until 9:30 a.m.). AR 671-73.

From November 2016 to May 2017, Dr. Rathe's treatment records reflect that Gilbert did well on lithium (despite beginning to taper her other medications one by one against Dr. Rathe's advice because she wanted to try to conceive). AR 656-669, 843. Gilbert reported sufficient motivation to do household chores and go shopping. *Id.* She began working fifteen hours a week at an elementary school cafeteria, which she reported "getting the hang of it ok" despite the fast pace and lack of orientation (it used hands-on learning), noting she "follows orders well but can't yet self-start the task list"; and later noting she "can't remember day to day what she's supposed to do there because the cafeteria schedule changes throughout the week," but her coworkers "[we]re helpful." *Id.* She missed three appointments with Dr. Rathe in January and March 2017 and "missed [a lot] of work because of being sick with the flu," but there is no evidence she missed appointments or work because of her mental health symptoms. AR 659. Gilbert felt well enough to start her own in-home daycare and to have a baby (although Dr. Rathe expressed concern Gilbert would decompensate with the added stress). AR 656, 658, 661, 842.

Substantial evidence supports the ALJ's conclusion that "[m]edications have been effective in reducing or controlling [Gilbert's] symptoms when used appropriately" and

that the overall record and Gilbert's activities of daily living are inconsistent with the extreme limitations opined by Dr. Rathe. AR 20. Although the record reflects that Gilbert suffers some limitations in maintaining attention and concentration, it does not support a total inability to concentrate for extended periods of time, as found by Dr. Rathe; instead, as the ALJ found, the record supports that Gilbert could concentrate for "simple, routine tasks": Gilbert was able to maintain sufficient concentration to study, participate in class, take examinations, and successfully graduate from community college; she was able to work fifteen hours a week at an elementary school cafeteria (and no evidence suggests she would not have been able to extend each work day to work full-time hours); and she was often able to concentrate to perform simple chores, make simple recipes, follow the plot of television shows, make scrapbooks, and watch her niece's softball games. AR 269, 332, 435, 535, 543, 547, 627, 656, 674, 677, 680, 687, 690, 694, 709, 713, 727, 733, 737, 739-40, 744, 749.

The ALJ also suggested that Dr. Rathe's "[t]reatment notes do not indicate missed appointments at a rate proportionate to 3 times per month." AR 20. Although I agree with Gilbert that the rate a claimant misses psychiatric appointments does not necessarily correlate to the rate a claimant will miss work, I disagree that the amount of times Gilbert missed her field experience hours in the spring of 2016 supports Dr. Rathe's finding that Gilbert would miss work more than three times a month. Reviewing the treatment records as whole, Gilbert's mental health appears to have been at its worst during the spring of 2016, which seemed to be the result of medication changes and not taking her medication as prescribed, as well as the stress of her final semester of community college. The ALJ limited Gilbert to low-stress work, which is arguably much less stressful than college. Substantial evidence supports the ALJ's conclusion that Dr. Rathe's finding that Gilbert would miss work more than three times a month is inconsistent with the record as a whole.

20

Overall, the ALJ gave good reasons, supported by substantial evidence, for discounting Dr. Rathe's RFC opinion. *See Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (noting that when the ALJ gave multiple reasons for discounting treating-source opinion, some of which were "sufficient" standing alone, it was irrelevant whether other reasons given by the ALJ were "good" or supported by substantial evidence). I recommend finding that the ALJ did not err in evaluating Dr. Rathe's RFC opinion.

### B. Failure to Acknowledge Therapist's Opinion

Therapist Burrow provided therapy to Gilbert through the student health center while Gilbert attended community college from April 2014 to May 2016 (but not during summer and winter breaks). Her treatment notes are not in the record, and the ALJ did not address the letter Therapist Burrow sent evaluating Gilbert's limitations. AR 440-42. Gilbert argues that the ALJ's failure to address Therapist Burrow's letter and develop the record by obtaining her treatment notes requires remand.

Therapist Burrow, as a licensed mental health counselor by the state of Iowa with a Master's degree in counseling or a related field, is not considered an "acceptable medical source" under the Social Security Regulations. *See* **20 C.F.R. § 404.1502(a)**. But the regulations provide that the ALJ should consider opinions from a nonacceptable medical source "using the same factors" as used when evaluating a treating-source or other medical opinion. **20 C.F.R. § 404.1527(f)(1)**. Under 20 C.F.R. § 404.1527(f)(2), an ALJ "generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case."

The ALJ should have addressed Therapist Burrow's opinion. But Therapist Burrow generally opined that Gilbert suffers from the same limitations as found by Dr.

Rathe, and the other information contained in Therapist Burrow's opinion (about Gilbert's accommodations at school, for example) also appears in Dr. Rathe's treatment notes, which the ALJ discussed. *See* AR 440-42, 908-13. The ALJ's discussion of Dr. Rathe's RFC opinion and reasoning for discounting that opinion also supports that the ALJ would have found Therapist Burrow's opinion inconsistent with the overall record and would not have assigned it much weight. Because the ALJ's discussion of the evidence in the opinion as a whole demonstrates the ALJ's reasoning for discounting Therapist Burrow's opinion, remand is not required for the ALJ to evaluate Therapist Burrow's opinion. *See Hopper v. Colvin*, No. 1:13CV00004 AGF/NAB, 2014 WL 1048556, at *11 (E.D. Mo. Mar. 17, 2014) (holding that although ALJ should have addressed nonacceptable source's second RFC opinion issued two years after the first, any error was harmless because addressing the opinion "would have no practical effect on the outcome of the case," since the source's second RFC opinion "was substantially similar to the [first] statement," which the ALJ discussed and assigned "no weight").

This is not a case in which the unaddressed mental RFC opinion was the only mental RFC opinion in the record from a provider who treated the claimant's mental health. *Cf. Taillefer v. Colvin*, No. CV 14-1281 (SRN/SER), 2016 WL 617121, at *16-18 (D. Minn. Jan. 29, 2016) (remanding when ALJ failed to address nonacceptable source's physical RFC opinion, who "was the only source who both treated [claimant] and provided function by function opinions regarding [claimant's] physical limitations, including limitations regarding his ability to sit, stand, and walk"), *report and recommendation adopted*, 2016 WL 614380 (Feb. 16, 2016); *Neeson v. Colvin*, No. 2:12-CV-51 SNLJ(SPM), 2013 WL 5442911, at *10-11, *13 (E.D. Mo. Sept. 30, 2013) (remanding when ALJ failed to address nurse's opinion "given that [the] opinion included significant limitations not reflected in the ALJ's RFC, and given the lack of other opinion evidence from other sources who treated or examined [claimant]"); *Watson v. Astrue*,

No. 08-6006-CV-SJ-NKL-SSA, 2009 WL 4728991, at *5 (W.D. Mo. Dec. 4, 2009) (remand required when the ALJ did not mention nonacceptable source's RFC opinion and she was "the only examining practitioner to give an assessment of [claimant's] physical [RFC]"). Here, the ALJ evaluated and addressed Gilbert's treating psychiatrist's RFC opinion, which was substantially similar to the unaddressed opinion. This fact distinguishes the case relied upon by Gilbert, *Fett v. Colvin*, No. C 14-3034-MWB, 2015 WL 5999835, at *20 (N.D. Iowa Oct. 15, 2015), in which the only medical opinions discussed by the ALJ were those of the nonexamining state agency consultants (and the nonacceptable source, whose opinion the ALJ failed to address, was "one of only a few providers who treated [claimant's physical] condition during the applicable time period"). The court's report and recommendation in *Anderson v. Commissioner of Social Security*, No. 18-CV-0024-LRR (N.D. Iowa Jan. 25, 2019), Doc. 20, cited by Gilbert, is also distinguishable, as that case involved an unaddressed opinion from a consultative examiner, and no other opinions in the record from a treating or examining provider "indicat[ed] that the claimant is disabled or . . . ha[d] limitations greater than those determined" by the ALJ. Doc. 20 at 12-16.

Neither does the ALJ's failure to obtain Therapist Burrow's treatment records require remand.

> [I]t is the ALJ's duty to develop the record fully and fairly. This duty includes the responsibility of ensuring that the record includes evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue.

***Strongson v. Barnhart***, 361 F.3d 1066, 1071-72 (8th Cir. 2004) (citations omitted). Here, as in *Strongson*, "there is substantial psychological evidence in the record, from both treating and examining physicians," including Dr. Rathe's treatment notes and the results of neuropsychological testing. *See id.* at 1072. Accordingly, the ALJ did not err in failing to further develop the record by obtaining Therapist Burrow's treatment

records.  *See id.* at 1070-72 (rejecting claimant's argument that "the ALJ's failure to request the treatment notes or opinions of [claimant's] therapist . . . constituted a dereliction of his duty to develop the record).  I recommend denying Gilbert's request to remand on this basis.


### C. Some Medical Evidence

When determining a claimant's RFC, the ALJ must consider "all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."  *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).  The ALJ's RFC determination must be supported by at least some medical evidence from a medical professional that "addresses the claimant's ability to function in the workplace."  *Hutsell*, 259 F.3d at 712 (quoting *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)).  Gilbert argues that the ALJ erred by failing to explicitly include a limitation to "one- to two-step tasks" in his RFC assessment and that even if the ALJ purposefully meant to exclude such a limitation, no medical evidence supports the ALJ's failure to limit Gilbert's RFC to work involving only one- to two-step tasks.  *See* Doc. 10 at 5-8; Doc. 12 at 3.

Gilbert argues that by including a limitation in her RFC to "simple, routine tasks, with simple work[-]related decisions and few if any changes in work setting" (AR 15), the ALJ meant to limit her to jobs involving "simple one- or two-step instructions"—jobs characterized by the Dictionary of Occupational Titles (DOT) as "reasoning level 1." The reasoning level in the DOT is one category of the general educational development measurement, which "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance" and is ordinarily "obtained in elementary school, high school, or college," but "may be obtained from experience

24

and self-study." **DOT, App. C**. Reasoning Levels one through three require a claimant to:

- LEVEL 1 - Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.
- LEVEL 2 - Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.
- LEVEL 3 - Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

*Id.*

Here, it does not appear that the ALJ meant to limit Gilbert to work involving only one or two steps, as opposed to simple work generally. The VE explicitly testified that the work he identified for Gilbert (that the ALJ ultimately determined Gilbert could perform) involved "simple routine tasks, simple work-related decisions, and few if any changes in work setting," but required a reasoning level of two and would require the performance of at least three steps. AR 22, 76-78, 82-84. Moreover, in *Moore v. Astrue*, 623 F.3d 599, 602, 604-05 (8th Cir. 2010), the Eighth Circuit held that there was no inconsistency between the claimant's ability "to handle simple job instructions; . . . to adapt to infrequent work changes; and . . . [to] perform[] basic mental demands of simple, routine, and repetitive work activity at the unskilled task level"; and the claimant's ability to perform jobs identified by the DOT as requiring a reasoning level of two. The court reasoned "the ALJ did not limit 'simple' job instructions to 'simple *one- or two-step* instructions' or otherwise indicate that [claimant] could perform only occupations at a DOT Level 1 reasoning level." *Id.* at 604 (emphasis omitted). That same reasoning applies here.

25

Gilbert argues that the medical evidence supports a limitation to one- to two-step work. There are several medical opinions in the record. Nonexamining state agency consultants Drs. Brandon and Wright evaluated Gilbert's RFC in August and November 2015, respectively, and found her moderately limited in her ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting. AR 95-96, 109-110. Drs. Brandon and Wright concluded that despite these limitations, Gilbert retained the RFC "to perform simple, repetitive tasks consisting of 1 to 2 step commands." AR 97, 111-12. The ALJ assigned Drs. Brandon's and Wright's opinions "partial weight" after noting that they were "fairly well supported and consistent with other evidence," but that the ALJ "also considered evidence not available to the state agency medical consultants." AR 19-20.

In the categories that the state agency consultants found Gilbert moderately limited, Dr. Rathe found her markedly or extremely limited, in addition to finding limitations in many other areas. AR 911-13. As discussed above, the ALJ assigned little weight to Dr. Rathe's opinion. AR 20.

Dr. Roland evaluated Gilbert's RFC after a one-time consultative examination in June 2015 ordered by the Social Society Administration. AR 517-22. He noted:

> Memory was intact for recent and remote events. Immediate retention and recall was reasonably intact as measured by [Gilbert's] ability to remember 2 out of 3 unrelated words following a five minute delay. This indicates the ability to remember 2 and perhaps 3 step instructions given by supervisory personnel.

AR 520. He ultimately concluded that Gilbert's "[m]emory and intellect are sufficient for employment purposes" and that by Gilbert's "own spontaneous admission, the main reason she is currently not working is secondary to being a full[-]time [community

26

college] student." AR 522. The ALJ assigned partial weight to Dr. Roland's opinion, noting his "findings are consistent [with] some other evidence, but the record as a whole supports a somewhat more restrictive [RFC]." AR 18. As the Commissioner notes, the ALJ was seemingly referring to Dr. Roland's finding that Gilbert "is able to relate effectively to employers, supervisors, and residents/customers," which stands in contrast to the ALJ's RFC determination limiting Gilbert to work requiring only occasional contact with supervisors and coworkers and no contact with the public. AR 15, 522.

Finally, Dr. Roberts performed a one-time neuropsychological examination at the request of Dr. Rathe in February 2015. AR 427. His testing revealed:

> Short-term Verbal Memory
> Story Memory
>      Immediate Recall: 63rd percentile, average
>      Delayed Recall: 5th percentile, mildly defective
> List-Learning
>      Initial Learning: 75th percentile, high average
>      Delayed Recall: 25th percentile, low average
> . . .
> Short-term Nonverbal Memory
>      Benton Visual Retention Test; 96th percentile, superior
>      Delayed Recall of RBANS figure: 61st percentile, average.

AR 430. Dr. Roberts noted that Gilbert's "performances on tasks assessing delayed recall of newly learned verbal information were below expectations based upon the patient's verbal IQ and attentional functioning," that "delayed recall of nonverbal information was clearly better than delayed recall of newly learned verbal information," and that "[t]his disparity raises the question of likely left temporal lobe dysfunction and is consistent with the reported area of major impact during her [motor vehicle accident] in 2002." *Id*. He found Gilbert's "[p]oor recent memory for newly learned verbal material did not appear to be reasonably attributable to problems with basic attention and concentration." AR 431. Dr. Roberts concluded that Gilbert "is likely to do better in employment and learning environments that are highly structured in nature and which

27

have 'right answers'" and that "she will undoubtedly have to work extra-hard to pass classes that test her on newly learned verbal material" and may need accommodations such as "multiple-choice quizzes" or "open-book" tests rather than short-answer, closed book tests. AR 432. The ALJ assigned Dr. Roberts's conclusion regarding Gilbert's ability to be successful in a structured environment "great weight," finding that it was "supported and consistent with the evidence as a whole and provide[d] the best description of the claimant's ability to function." AR 18.

Here, I agree with the Commissioner that both Dr. Roland's and Dr. Roberts's RFC opinions, in combination with the ALJ's independent review of the medical evidence, support the ALJ's decision not to limit Gilbert to work involving only one- or two-step tasks. Although Dr. Roland concluded that the results of one of his tests "indicate[d] the ability to remember 2 and perhaps 3 step instructions given by supervisory personnel," he ultimately concluded that Gilbert's "[m]emory and intellect are sufficient for employment purposes." AR 520, 522. And Dr. Roberts's neuropsychological testing demonstrated that Gilbert suffered limitations in recalling "newly learned verbal information," but not nonverbal information, and he ultimately concluded that she could succeed in highly structured environments with "right answers," without imposing a limitation to one- or two-step tasks. AR 430, 432. These opinions, in combination with the treatment notes (discussed above in connection with the weight assigned to Dr. Rathe's opinion) and Gilbert's activities of daily living (including completing her degree with accommodations and working as a kitchen helper, a position the DOT defines as having a reasoning level of two),[6] constitute substantial evidence, including some medical evidence, in support of the ALJ's RFC determination that Gilbert is not limited to work involving only one and two steps.

---

[6] *See* AR 75, 312; **DOT § 318.687-010**. I recognize that the ALJ ultimately concluded that Gilbert could not work as a kitchen helper (likely due to limitations in social interaction).

28

### D. Appointments Clause Challenge

The Appointments Clause of the Constitution requires that principal officers be appointed by the president with the advice and consent of the Senate and that inferior officers be appointed by "the President alone, . . . the Courts of Law, or . . . the Heads of Departments." **U.S. Const. art. II, § 2, cl. 2**; *see also Lucia*, 138 S. Ct. at 2051 & n.3. The Appointments Clause does not apply to "non-officer employees—part of the broad swath of 'lesser functionaries' in the Government's workforce." *Lucia*, 138 S. Ct. at 2051.

The Supreme Court recently held in *Lucia* that the five ALJs for the Securities and Exchange Commission (SEC) are "inferior officers" subject to the Appointments Clause, as they "exercise[] significant authority pursuant to the laws of the United States." *Id.* The Court relied on *Freytag v. Commissioner*, 501 U.S. 868 (1991), in which it held special trial judges of the United States Tax Court were inferior officers subject to the Appointments Clause, noting that both SEC ALJs and Tax Court special trial judges: (1) serve career appointments "to a position created by statute, down to its 'duties, salary, and means of appointment'"; (2) take testimony during hearings and may take pre-hearing depositions; (3) administer oaths, rule on motions, and generally regulate the court during a hearing; (4) rule on the admissibility of evidence; (5) have the power to enforce compliance with discovery, including to punish contempt by excluding people from the courtroom; and (6) issue opinions detailing factual findings and legal conclusions and ordering appropriate remedies. 138 S. Ct. at 2052-54 (quoting *Freytag*, 501 U.S. at 878). The Court ordered that the petitioner receive a new administrative hearing from a properly appointed official, noting that the petitioner "timely challeng[ed]" the validity of the appointment before the administrative agency. *Id.* at 2055. The petitioner had not raised the Appointments Clause challenge to the ALJ at any point during the "nine days

of testimony and argument," but after the ALJ rendered an unfavorable decision, the petitioner appealed to the SEC and argued "that the administrative proceeding was invalid because [the ALJ] had not been constitutionally appointed." *Id.* at 2050.

Relying on the reasoning in *Lucia*, Gilbert argues that Social Security ALJs are inferior officers subject to the Appointments Clause and that her case should be remanded for a new hearing before a constitutionally appointed ALJ. Gilbert never raised this issue during the administrative proceedings. Thus, the Commissioner argues that Gilbert has forfeited her Appointments Clause challenge.

In *Freytag*, the petitioners challenged the appointment of the special trial judge for the first time on judicial review—indeed, the petitioners had consented in the administrative proceedings to trial by a special trial judge. 501 U.S. at 871-72. Before the Supreme Court, they argued that Appointments Clause challenges as a class cannot be forfeited or waived. *Id.* at 893 (Scalia, J., concurring). The majority opinion did not address this argument, instead "exercis[ing] its discretion to consider" the Appointments Clause challenge (which it classified as a "nonjurisdictional structural constitutional objection[]"). *Id.* at 878-79 (majority); *id.* at 893 (Scalia, J., concurring). The Court noted the Appointments Clause challenge was "neither frivolous nor disingenuous" and went "to the validity of the Tax Court proceeding." *Id.* at 879 (majority). The Court therefore concluded this was "one of those rare cases in which [a court] should exercise [its] discretion." *Id.* The Eighth Circuit has interpreted *Freytag* as creating a discretionary rule in which "a reviewing court generally is permitted (though not obliged) to hear a belated appointments clause challenge." *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 795 (8th Cir. 2013); *see also Jones Bros., Inc. v. Sec. of Labor, Mine Safety, & Health Admin.*, 898 F.3d 669, 677-78 (6th. Cir. 2018) (excusing forfeiture of Appointments Clause challenge when the plaintiff noted a circuit split on the issue before the administrative agency (Federal Mine Safety and Health Review Commission) but

declined to "press" the issue); ***Turner Bros., Inc. v. Conley***, 757 F. App'x 697, 699-700 (10th Cir. 2018) (holding claimant forfeited Appointments Clause challenge based on *Lucia* by failing to raise it to the agency (the Department of Labor Benefits Review Board)); ***Kabani & Co., Inc. v. SEC***, 733 F. App'x 918, 919 (9th Cir. 2018) ("[P]etitioners forfeited their Appointments Clause claim by failing to raise it in their briefs or before the agency [the SEC].").

The vast majority of courts to address this issue have held that the claimant forfeited his or her *Lucia*-based Appointments Clause challenge by failing to raise it to the Social Security Administration, and the courts have declined to excuse the forfeiture. *See, e.g.,* ***Morrow v. Berryhill***, No. C 18-04641 WHA, 2019 WL 2009303, at *4 (N.D. Cal. May 7, 2019); ***Kline v. Berryhill***, No. 3:18-CV-00180-FDW, 2019 WL 1782133, at *6 (W.D.N.C. Apr. 23, 2019); ***Hutchins v. Berryhill***, No. 18-10182, 2019 WL 1353955, at *3 (E.D. Mich. March 26, 2019) (rejecting report and recommendation); ***Diane S.P. v. Berryhill***, No. 4:17cv143, 2019 WL 1879256, at *23 (E.D. Va. Mar. 21, 2019) (adopting report and recommendation); ***Valasquez ex rel. Valasquez v. Berryhill***, No. CV 17-17740, 2018 WL 6920457, at *2-3 (E.D. La. Dec. 17, 2018) (collecting cases), *report and recommendation adopted*, 2019 WL 77248 (Jan. 2, 2019); ***Flack v. Comm'r of Soc. Sec.***, No. 2:18-cv-501, 2018 WL 6011147, at *4 (S.D. Ohio Nov. 16, 2018) (collecting cases), *report and recommendation adopted*, 2019 WL 1236097 (S.D. Ohio Mar. 18, 2019). A few courts, however, have found Social Security claimants do not need to raise Appointments Clause challenges to preserve the argument for judicial review or have otherwise excused the forfeiture. *See* ***Ready v. Berryhill***, No. CV 18-04289, 2019 WL 1934874, at *2 (E.D. Pa. Apr. 30, 2019); ***Culclasure v. Comm'r of Soc. Sec. Admin.***, No. 18-1543, 2019 WL 1641192, at *12 (E.D. Penn. Apr. 16, 2019); ***Bradshaw v. Berryhill***, No. 5:18-CV-00100-RN, 2019 WL 1510953, at *2-11 (E.D.N.C. Mar. 26, 2019); ***Probst v. Berryhill***, No. 5:18-CV-130-JG, 2019 WL

1749135, at *8 (E.D.N.C. March 22, 2019); *Bizarre v. Berryhill*, 364 F. Supp. 3d 418, 425 (M.D. Penn. 2019); *Fortin v. Comm'r of Soc. Sec.*, No. CV 18-10187, 2019 WL 421071, at *1-4 (E.D. Mich. Feb. 1, 2019), *report and recommendation rejected in relevant part*, No. 18-10187, 2019 WL 1417161 (E.D. Mich. Mar. 29, 2019); *Muhammad v. Berryhill*, No. CV 18-172, 2019 WL 2248694, at *11-12 (E.D. Pa. Nov. 2, 2018), *report and recommendation rejected*, *id.* at *3-7 (May 23, 2019).

I decline to follow decisions from district courts outside the Eighth Circuit. Every district court in the Eighth Circuit to address the issue (including the Northern District of Iowa) has found a Social Security claimant's Appointments Clause challenge raised for the first time on judicial review to be forfeited. *See Kesterson v. Berryhill*, No. 18-CV-2048-LRR, 2019 WL 1938809, at *18 (N.D. Iowa May 1, 2019) (Roberts, J.) (report and recommendation); *Sexton v. Berryhill*, No. 18-CV-1024-LTS, 2019 WL 1495286, at *15 (N.D. Iowa Apr. 4, 2019) (Roberts, J.) (report and recommendation); *Hernandez v. Berryhill*, No. 8:18CV274, 2019 WL 1207012, at *6 (D. Neb. Mar. 14, 2019); *Murphy v. Berryhill*, No. 18-CV-61-LRR, 2019 WL 1140235, at *17 (N.D. Iowa Mar. 12, 2019) (Roberts, J.); *Kimberly B. v. Berryhill*, No. 17-CV-5211 (HB), 2019 WL 652418, at *15 (D. Minn. Feb. 15, 2019); *Audrey M.H. v. Berryhill*, No. 17-CV-4975 (ECW), 2019 WL 635584, at *12 (D. Minn. Feb. 14, 2019); *White v. Berryhill*, No. 18-CV-2005-LTS, 2019 WL 586757, at *15 (N.D. Iowa Feb. 13, 2019) (Roberts, J.), *report and recommendation adopted*, 2019 WL 1239852 (N.D. Iowa Mar. 18, 2019); *Catherine V. v. Berryhill*, No. CV 17-3257 (DWF/LIB), 2019 WL 568349, at *2 (D. Minn. Feb. 12, 2019*)*; *Bowman v. Berryhill*, No. 4:18-CV-157 RP-HCA, 2018 WL 7568360, at *12 (S.D. Iowa Dec. 13, 2018); *Stearns v. Berryhill*, No. 17-CV-2031-LTS, 2018 WL 4380984, at *6 (N.D. Iowa Sep. 14, 2018) (Strand, C.J.); *Davis v. Comm'r of Soc. Sec.*, No. 17-cv-80-LRR, 2018 WL 4300505, at *8-9 (N.D. Iowa Sept. 10, 2018) (Reade, J.); *Iwan v. Comm'r of Soc. Sec'y*, No. 17-CV-97-LRR, 2018 WL

4295202, at *9 (N.D. Iowa Sep. 10, 2018) (Reade, J.); ***Thurman v. Comm'r of Soc.***
***Sec.***, No. 17-CV-35-LRR, 2018 WL 4300504, at *9 (N.D. Iowa Sept. 10, 2018) (Reade,
J.).[7]  I adopt the reasoning of these decisions (and of the majority of courts to address the
issue).  Accordingly, I recommend the district judge reject Gilbert's Appointments Clause
challenge.

## III.    CONCLUSION

I recommend that the district court judge **affirm** the Commissioner's decision and
enter judgment in favor of the Commissioner.

Objections to this Report and Recommendation must be filed within fourteen days
of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure
72(b).  Objections must specify the parts of the Report and Recommendation to which
objections are made, as well as the parts of the record forming the basis for the objections.
**Fed. R. Civ. P. 72**.  Failure to object to the Report and Recommendation waives the
right to *de novo* review by the district court of any portion of the Report and
Recommendation, as well as the right to appeal from the findings of fact contained
therein.  *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 4th day of September, 2019.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

[7] A court in the District of Nebraska noted that Appointments Clause challenges are deemed to
be "in the category of nonjurisdictional structural constitutional objections that could be
considered on appeal whether or not they were ruled upon below," but ultimately, the court did
not address the merits of the Appointments Clause issue, as the court was already remanding on
other grounds and noted that the claimant could raise the issue on remand to the Social Security
Administration.  *See Mann v. Berryhill*, No. 4:18-CV-3022, 2018 WL 6421725, at *8 (D. Neb.
Dec. 6, 2018).